# United States Court of Appeals
# for the Federal Circuit

---

**ROCKIES EXPRESS PIPELINE LLC,**
*Appellant,*

**v.**

**KEN SALAZAR, Secretary of the Interior,**
*Appellee.*

- - - - - - - - - - - - - - - - - - - - -

**KEN SALAZAR, Secretary of the Interior**
*Appellant,*

**v.**

**ROCKIES EXPRESS PIPELINE LLC,**
*Appellee.*

---

2012-1055, -1174

---

Appeals from the Civilian Board of Contract Appeals in No. 1821, Administrative Judge Allan H. Goodman.

---

Decided: September 13, 2013

---

L. POE LEGGETTE, Fulbright & Jaworski, L.L.P., of Denver, Colorado, argued for Rockies Express Pipeline

LLC. With him on the brief were OSBORNE J. DYKES, III, BENJAMIN M. VETTER and LUCY D. ARNOLD.

DOMENIQUE KIRCHNER, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for KEN SALAZAR, Secretary of the Interior. With her on the brief were STUART F. DELERY, Acting Assistant Attorney General, JEANNE E. DAVIDSON, Director, and HAROLD D. LESTER, JR., Assistant Director.

———————————

Before RADER, *Chief Judge*, REYNA, *Circuit Judge*, and DAVIS*, *Chief Judge*.

REYNA, *Circuit Judge*.

This case involves a dispute over the interpretation of a series of contracts entered into by Rockies Express Pipeline LLC ("Rockies Express") and Minerals Management Service, a unit of the Department of the Interior (collectively "Interior"). The dispute centers on the Royalty-in-Kind (RIK) provisions found in the contracts. The Civilian Board of Contract Appeals ("Board") determined that Interior had materially breached the contract, but that Rockies Express was only entitled to damages that had accrued before the Secretary of the Interior announced a decision to phase-out RIK contracts. We agree that Interior materially breached the contract, but we reverse the Board's decision to limit damages. Accordingly, we *affirm-in-part, reverse-in-part*, and *remand*.

———————————

* The Honorable Leonard Davis, Chief Judge of the United States District Court for the Eastern District of Texas, sitting by designation.

## I. BACKGROUND

In 2005, Rockies Express set out to build a $6.8 billion pipeline to ship natural gas from Wyoming to Eastern Ohio. The pipeline was to be built in two phases. The first phase, Rockies Express West, would be completed first and would stretch from Wyoming to Missouri. The second phase, Rockies Express East, would connect to Rockies Express West and continue from Missouri to Ohio. In exchange for building the pipeline, Interior agreed to pay Rockies Express a reservation charge for at least ten years per section, reserving 2.5% of the gas shipped on the pipeline.[1] Interior would receive the natural gas as a royalty-in-kind for gas Rockies Express extracted from federal land.[2] Interior agreed to pay the reservation charge regardless of whether or not it shipped gas on the pipeline and Rockies Express agreed to maintain shipping capacity for Interior. Interior also agreed to initial reservation charges for Rockies Express West of $1,207,540/month. Upon completion of Rockies Express East, Interior promised to pay reservation charges of

---

[1] In addition to reservation charges, Interior was obligated to pay commodity charges, which included usage charges, fuel-burn charges, lost and unaccounted for gas charges, and annual cost of gas adjustment charges.

[2] Under the RIK program, the government receives its royalty for mineral resources extracted pursuant to federal leases "in kind," i.e., in natural gas, rather than in value, or cash. *See* 30 U.S.C. § 192; 42 U.S.C. § 15902(b). In exchange, the government makes monthly payments to ensure that a certain quantity of the mineral resources is made available for its purposes. The government then enters into processing and transportation contracts to sell the mineral royalties, often at a substantial profit over royalties received in value.

$1,663,800/month. For Interior, the reservation charges created firm transportation capacity for its reserved natural gas. For Rockies Express, the reservation charges enabled it to recoup the massive capital investment it incurred in building the pipeline. The parties unquestionably intended for the relationship to continue for at least ten years following the completion of Rockies Express East. The terms guiding the relationship were considered and agreed upon prior to construction beginning on the pipelines.

As required by the Federal Energy Regulatory Commission, before construction could begin, Rockies Express and Interior entered into a Precedent Agreement in order to memorialize the parties' agreement. The Precedent Agreement is a primary agreement that obligated the parties to enter into follow-on agreements. During negotiations on the Precedent Agreement, Interior requested a termination for convenience clause or a clause that would allow it to terminate the agreements if Interior later abandoned the RIK program, but Rockies Express refused to agree to either clause. As a result, the parties agreed that under Provision 3(b) of the Precedent Agreement, Interior could terminate the agreement only if it was "directed by Legislative Action or *required by a change in the Federal or State policy* to discontinue taking gas in kind . . . upon (30) thirty days written notice to [Rockies Express]." Joint App'x 273 (emphasis added). Conversely, Rockies Express could be excused from liability to Interior upon the occurrence of certain events listed in Section 9(b) provided that it gave Interior a five-day notice. Most notably, Section 9(b)(v) provided that

> Transporter [*i.e.*, Rockies Express] shall have the right to terminate this Precedent Agreement with no liability to Shipper [*i.e.,* Interior] by giving Shipper five (5) days advance written notice (which notice must be given, if at all, within ten (10) days after the occurrence or nonoccurrence of

the relied upon-event) . . . , in the event: . . . Shipper fails to comply with any of its material obligations hereunder or under any FTSA then in effect . . . .

Joint App'x 279.

The Federal Energy Regulatory Commission reviewed the Precedent Agreement between Rockies Express and Interior, as well as the precedent agreements that Rockies Express entered into with eleven other shippers of natural gas, to determine if approval of the pipeline project was in the public interest. After reviewing the precedent agreements, the commission found that construction of the pipeline was in the public interest and treated all the precedent agreements as binding.

Section 8(a) of the Precedent Agreement obligated Interior to enter into Firm Transportation Service Agreements (FTSA) and Negotiated Rate Agreements, which would govern the shipment of gas over each segment of the pipeline:

Shipper agrees that it will execute a minimum of three[3] Firm Transportation Service Agreements consistent with the form of Service Agreement as contained in Appendix B hereto, as finally approved by [the Federal Energy Regulatory Commission] which, if Shipper shall have elected the Negotiated Reservation Rate Option, shall reflect the fixed nature of the reservation rate as described in Section 4, within five (5) business days after tender by Transporter.

Joint App'x 277. Pursuant to Section 8(a), an unexecuted, but agreed-upon, FTSA for Rockies Express West and

---

[3]    Three FTSAs were required because Rockies Express East actually consisted of two segments initially.

Rockies Express East was attached as Appendix B to the Precedent Agreement.

Based on the foregoing contracts, construction on the Rockies Express West pipeline commenced in 2006. Once construction concluded, Interior executed an FTSA on April 24, 2007, and the Rockies Express West pipeline went into service. Interior shipped gas on Rockies Express West for over a year without incident, including during the time construction was progressing on Rockies Express East. On May 16, 2008, shortly before Rockies Express East was completed, Rockies Express sent Interior the FTSAs for Rockies Express East, which had been drawn up from Appendix B of the Precedent Agreement. Rather than executing the FTSAs as required under the Precedent Agreement, Interior decided that the FTSA required Federal Acquisition Regulations (FAR) provisions, basing that decision on a non-binding memorandum from Interior's Office of Solicitor.[4] The parties negotiated FAR provisions, but failed to reach an agreement, and Interior ultimately refused to sign the Rockies Express East FTSA that Rockies Express tendered on November 25, 2008. On December 11, 2008, Rockies Express terminated the Precedent Agreement on the grounds that Interior was in material breach. Interior also stopped shipping gas on Rockies Express West on March 31, 2009, even though the Precedent Agreement obligated it to do so until Rockies Express East entered service. When Rockies Express East entered interim service on June 29, 2009, Interior refused to ship gas on it based on the parties' failure to execute an FTSA for Rockies Express East.

---

[4] We note that Interior did not insist on a similar requirement prior to executing the FTSA associated with Rockies Express West, which was for all purposes identical to the Rockies Express East FTSA.

On June 30, 2009, Rockies Express filed claims with the contracting officer for Interior's breach, citing Interior's refusal to execute the Rockies Express East FTSA and its failure to pay reservation charges on Rockies Express West from April 1 through June 28, 2009. On September 16, 2009, the Secretary of the Interior announced the agency's intention to phase-out RIK contracts and, on December 8, 2009, issued a memorandum instructing the Assistant Secretary of Land and Minerals Management to "proceed with the termination of the RIK program." Joint App'x 1268. Termination was to proceed according to a list of "guiding principles," including honoring all existing RIK sales contracts. Consequently, Interior allowed its RIK sales contract related to natural gas from Wyoming to expire on October 31, 2009, when the Rockies Express West FTSA was scheduled to conclude.

On November 30, 2009, Interior's contracting officer issued a Final Decision, concluding that Interior was not in breach for failing to enter into the Rockies Express East FTSA because the Precedent Agreement was not a binding contract and, in any event, Rockies Express committed the first material breach by terminating the agreement without a five-day notice.

Rockies Express appealed the decision of the contracting officer to the Board and argued that the Precedent Agreement was a binding contract that Interior breached by not signing the Rockies Express East FTSA. The Board held that the Precedent Agreement was a contract for procurement of services, thereby vesting it with jurisdiction, and that Interior breached the agreement by refusing to pay reservation charges on Rockies Express West and refusing to execute the Rockies Express East FTSA. The Board also found that Interior would have exercised the termination option pursuant to the agency's announced policy decision to stop taking RIK payments. As a result, the Board concluded that Interior was only liable for the reservation charges on Rockies Express

West ($3,542,121) and reservation charges on Rockies Express East through October 2009 ($3,319,104), not the ten-years-worth of reservation charges ($173,230,601), to which Rockies Express argued it was entitled.

In its appeal to this court, Rockies Express challenges the Board's conclusion that damages were limited by Interior's subsequent "policy" change. Interior cross-appeals the Board's exercise of jurisdiction over the Precedent Agreement and its liability under it. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(10).

## II. STANDARD OF REVIEW

The Board's factual determinations shall be set aside if they are arbitrary, capricious, or unsupported by substantial evidence. 41 U.S.C. § 7107(b)(2); *see TipTop Constr. Inc. v. Donahoe*, 695 F.3d 1276, 1281 (Fed. Cir. 2012). Its determinations on questions of law, including jurisdiction and interpretations of contracts, statutes, and regulations, are reviewed *de novo*. *Parsons Global Servs. Inc. v. McHugh*, 677 F.3d 1166, 1170 (Fed. Cir. 2012); *Brownlee v. DynCorp*, 349 F.3d 1343, 1349 (Fed. Cir. 2003).

## III. JURISDICTION

Under the Contract Disputes Act, the Board possesses jurisdiction to hear suits over any express or implied contract made by an Executive agency, including contracts for the "procurement of services." 41 U.S.C. §§ 7102(a)(2), 7105(e)(1)(B). Interior argues that the Board lacks jurisdiction in this case because the Precedent Agreement was not a procurement contract within the terms of the Contract Disputes Act because no services were procured under it. While the Contract Disputes Act does not define "procurement," Interior notes that this court has previously characterized procurement as "the acquisition . . . of property or services for the direct benefit or use of the Federal Government." *New Era Constr. v.*

*United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (emphasis omitted). In Interior's view, for a procurement contract to exist, there must be a buyer-seller relationship and the expenditure of government funds. Interior maintains that the Precedent Agreement is an agreement to agree in the future and that Interior would not "acquire any transportation service" until after execution of the FTSAs. As a result, there was no buyer-seller relationship or expenditure of government funds under the Precedent Agreement. We are not persuaded by Interior's arguments.

Congress defined "procurement" when it established the Office of Federal Procurement Policy, which oversees the direction of federal procurement policies, regulations, and procedures. *Distributed Solutions Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (citing 41 U.S.C. §§ 401-20). Specifically, 41 U.S.C. § 403(2) states that "'procurement' includes all stages of the process of acquiring property or services, beginning with the process of determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 403(2). This court has relied on this definition for procurement on multiple occasions. *See Res. Conservation Grp. LLC v. United States*, 597 F.3d 1238, 1244 (Fed. Cir. 2010); *Distributed Solutions*, 539 F.3d at 1345. While those cases involved defining the term, "procurement," in the context of the Court of Federal Claims' jurisdictional statute, the Tucker Act, we discern no reason that undermines the applicability of the definition to the portion of the Contract Disputes Act that defines the Board's jurisdiction. It follows that this definition of "procurement" is not limited to situations where money has changed hands or there is a buyer-seller relationship; rather, "procurement" covers "all stages of the process of acquiring property or services."

The Board's carefully-reasoned opinion recognizes that the Precedent Agreement bears all the hallmarks of

a traditional contract. It contains the essential terms and conditions, it was negotiated and approved by an authorized official, it is supported by consideration, and it contains an expressed statement of an intention to be bound. *See Rockies Express Pipeline LLC v. Dep't of the Interior*, CBCA 1821, 10-2 BCA ¶ 34,542, at 170,356–57. Furthermore, upon fulfillment of certain conditions precedent, the Precedent Agreement obligated the parties to enter into an agreed-upon FTSA, which was incorporated as an appendix to the agreement. *Id*. at 170,357. Unlike the independent contracts at issue in *Wesleyan Co. v. Harvey*, 454 F.3d 1375 (Fed. Cir. 2006), the principal case on which Interior relies, the Precedent Agreement is part of an interlocking set of agreements through which both parties were bound. We refuse to convert the Precedent Agreement into a mere options contract from which Interior could withdraw at its leisure, thereby causing Rockies Express to bear an unanticipated share of the expense involved in constructing a $6.8 billion pipeline. Therefore, we hold that the Precedent Agreement is a contract for the procurement of transportation services justiciable under the Contract Disputes Act. Having determined that the Board and this court have jurisdiction, we now turn to the merits of the dispute.

## IV. DISCUSSION

We must decide whether Interior breached the Precedent Agreement and, if so, the amount of damages, if any, to which Rockies Express is entitled. The Board held that Interior's refusal to sign the Rockies Express East FTSA breached the Precedent Agreement. As a defense to its alleged breach, Interior contends that the Rockies Express East FTSA would have been an illegal contract for three reasons. First, Interior argues that a ten-year contract term "is contrary to statute and no government official could have agreed to it." Interior's Br. 26 (citing 41 U.S.C. § 3903). At bottom, Interior argues that its promise to enter into the Rockies Express East FTSA was

an illegal promise and thus unenforceable. Second, Interior claims that the Rockies Express East FTSA did not include a termination for convenience clause and that this clause was required by our predecessor court's holding in *G.L. Christian & Associates v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963). According to Interior, its refusal to sign the Rockies Express East FTSA without this clause was not a breach of the Precedent Agreement. Third, Interior argues that while an agency head can authorize deviations from the FAR, the contracting officer lacked authority to bind the government to a promise to sign future FTSAs because no deviation eliminating the need for a termination for convenience clause was obtained prior to the Precedent Agreement's execution. We are not convinced by Interior's contract-based defenses.

We first address whether the Rockies Express East FTSA would have been unenforceable because of its ten-year term. We note that Interior has not established that FAR provisions contained in the procurement statutes are applicable to the Precedent Agreement. Where there is a question over the applicability of the procurement statutes, a contract is unenforceable only when the *contractor* caused the illegal award, or the illegality was so obvious that the contractor should have recognized it. *United States v. Ahmdal Corp.*, 786 F.2d 387, 395 (Fed. Cir. 1986). When an illegality is not obvious, a contractor should be accorded the benefit of all reasonable doubts and the award upheld. *John Reiner & Co. v. United States*, 325 F.2d 438, 440 (Ct. Cl. 1963).

The Energy Policy Act of 2005 governs RIK transportation contracts "[n]otwithstanding any other provisions of law." 42 U.S.C. § 15902; *see also Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (noting that the use of a "notwithstanding" clause signals the drafter's intention that the section override conflicting provisions elsewhere). While traditional procurement contracts are subject to appropriations regulations requiring shorter contract

terms than the ten years specified in the FTSAs in this case, RIK contracts specifically are governed by the provisions contained in § 15902, which contain no such limitation. The statute is clear that RIK transportation contracts are removed from the scope of traditional procurement rules.

We agree with the government that it may cancel as illegal a contract that violates procurement statues or regulations, *see Schoenbrod v. United States*, 410 F.2d 400, 403–04 (Ct. Cl. 1969), but Interior has conceded that the FTSAs are not illegal contracts. Specifically, Interior is not contesting its liability under the Rockies Express West FTSA, which in all material respects is the same as the Rockies Express East FTSA. The Board concluded that Interior owes Rockies Express over $3 million for breaching the Rockies Express West FTSA, and Interior does not dispute this finding on appeal. Interior cannot escape liability on the grounds that the same contract provisions in Rockies Express West for which it assumed liability are illegal in Rockies Express East. It follows that if Rockies Express can recover under the Rockies Express West FTSA, it should also have a remedy for Interior's breach related to the Rockies Express East FTSA. *See Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988); *see also Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970) ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government.").

Finally, the Board observed that Rockies Express does not have a history of contracting with the government. Thus, it was presumably unaware of whether a particular FAR provision might be applicable. In any event, there is no evidence that Rockies Express created or overlooked an obvious illegality, assuming one existed. As such, we accord Rockies Express the benefit of all reasonable doubts and uphold the Board's determination that the Precedent Agreement was a legally binding contract. *See*

*John Reiner & Co.*, 325 F.2d at 440 ("It is therefore just to the contractor, as well as to the Government, to give him the benefit of reasonable doubts [when the issue of legality is very close] and to uphold the award unless its invalidity is clear.").

We now turn to Interior's second argument that the absence of a termination for convenience clause in the Precedent Agreement excuses its refusal to sign the Rockies Express East FTSA. This argument incorrectly assumes that the Precedent Agreement required a termination clause in the first place. *Christian* stands for the proposition that if the parties to a government contract neglect to include a clause in the contract *that is otherwise required by regulation* (*e.g.*, a termination for convenience clause), courts will read the clause into the contract as a matter of law. 312 F.2d at 426–27. Here, Interior has not shown that the Precedent Agreement was necessarily covered by the FAR, or that the termination for convenience clause was necessarily required. Nor has Interior established that a termination for convenience clause is required in RIK contracts by law or regulation such that the parties neglected to include one. As we have previously observed, the "[n]otwithstanding any other provisions of law" provision in § 15902 excepts RIK contracts from provisions normally required by the procurement statutes. Consistent with this exception, the Director of the Minerals Management Service instructed the RIK program to use standard industry contracts. As the contracting officer noted, a termination for convenience clause is the antithesis of an industry practice and would "totally run counter to [Interior's] approach in royalty in kind." *Rockies Express*, 11-2 BCA ¶ 34,847, at 171,414. In any event, violation of the *Christian* doctrine does not render a contract illegal; it permits the court to cure the defect and include the clause after the fact. 312 F.2d at 427.

Interior's third argument is also without merit. In pressing it, Interior essentially contends that the con-

tracting officer lacked authority to enter into the Precedent Agreement, which obligated Interior to sign future FTSAs, because he had not sought a deviation from the required termination for convenience clause. This argument essentially repackages Interior's second argument, which we rejected above. Additionally, Interior concedes that it could have sought a deviation from any FAR provision it believed applied, which it did not do. Accordingly, we affirm the Board's conclusion that even assuming FAR provisions were required, Interior breached the Precedent Agreement by refusing to seek a deviation from the FAR provisions when negotiating the Rockies Express East FTSA. *Cf. Rockies Express*, 11-2 BCA ¶ 34,847, at 171,421–22 (citing 48 C.F.R. § 1.401); *see also* 48 C.F.R. § 1.402. In particular, we affirm the Board's conclusions that Interior breached the following provisions of the Precedent Agreement: Section 12, which states that the Precedent Agreement is a "legal, valid, binding and enforceable obligation" of the parties; Section 10, which authorizes modifications only when ordered or required by a "law, order, decision, rule, or regulation"; and Section 8(a), which states that Interior "agrees it will execute a minimum of three [FTSAs]" consistent with the form agreement attached to the Precedent Agreement. *Rockies Express*, 11-2 BCA ¶ 34,847, at 171,421–22. Interior breached Section 12 by insisting that the Precedent Agreement was illegal and unenforceable instead of treating it as legal, valid, binding and enforceable obligation. It breached Section 10 by requiring a modification in the form of a termination for convenience clause that was not required by any law, order, decision, rule or regulation. And it breached Section 8(a) by refusing to seek a deviation that would have allowed it to execute the Rockies Express East FTSA without the additional FAR provisions. Accordingly, we hold that Interior materially breached the Precedent Agreement upon its refusal to enter into the Rockies Express East FTSA.

Interior contends alternatively that Rockies Express breached the Precedent Agreement first by prematurely terminating it.  Interior argues that under Provision 9(b) of the Precedent Agreement, Rockies Express was required to provide a five-day notice before terminating the Precedent Agreement.  Interior misreads Provision 9(b).  Provision 9(b) sets out the procedure under which Rockies Express may terminate the Precedent Agreement so as to relieve *itself* of liability upon the occurrence of certain events, including "[Interior's] fail[ure] to comply with any of its material obligations [under the Precedent Agreement]."  Joint App'x 279.  By declaring the Precedent Agreement breached and terminating it, Rockies Express did not seek to relieve itself of liability, but instead sought to establish Interior's culpability for the breach.  Consequently, the five-day notice requirement of Provision 9(b) does not apply.

The remaining issue is the quantum of the damages owed to Rockies Express.  The Board relied on a double inference to limit damages as of October 31, 2009.  Specifically, the Board reasoned that had Interior executed the Rockies Express East FTSA, Interior would have terminated the Rockies Express East FTSA under Provision 3(b) following the Secretary's announcement of the agency's "policy" change with respect to the RIK program.  Provision 3(b) of the Precedent Agreement provides that interior may terminate the Precedent Agreement when it is "*directed by* Legislative Action or *required by* a change in Federal . . . policy."  Joint App'x 273 (emphasis added).  It follows that Interior could have terminated the Precedent Agreement if one of the two following scenarios had occurred: Congress enacted legislation that specifically directed Interior to stop accepting RIK payments or that declared existing RIK contracts null and void, or a change in Federal policy was implemented that required Interior to terminate the RIK program.  It is undisputed that there was no legislative action directing Interior to stop

taking gas-in-kind. The Board, however, concluded that the Secretary initiated a change in Federal policy that required Interior to terminate the RIK program and withdraw from the Rockies Express East FTSA.

We note at the outset that some members of Congress, most notably the chair of the House Committee on Natural Resources, Congressman Rahall, had attempted to terminate the RIK program through legislative action for several years without success. Indeed, it was during a hearing on Chairman Rahall's proposed legislation for terminating the program that the Secretary of Interior announced the agency's intention to phase out the RIK program. Almost three months later, the Secretary followed up on the announced intention by issuing a memorandum in which he directed the Assistant Secretary of Land and Minerals Management to proceed with the termination of the RIK program. The Secretary, however, instructed that the termination was to proceed according to a list of "guiding principles." One of the principles listed was that all existing RIK sales contracts would be honored.

The Board's conclusion that the Secretary's actions amount to a change in Federal policy overlooks the Secretary's guiding principle that all existing RIK sales contracts would be honored. Assuming that the Rockies Express East FTSA had been executed by Interior in 2008 as it was obligated to do, there is no question that the FTSA would constitute an "existing RIK sales contract" when the Secretary's memorandum issued in December 2009. Accordingly, even under the Secretary's RIK program phase-out, Interior was obligated to honor the Rockies Express East FTSA for the full ten-year duration of that agreement. This means that there was no change in Federal policy that would have affected the Rockies Express East FTSA.

The language contained in Provision 3(b) further convinces us that the Secretary's statements did not create a change in Federal policy even in a broader sense. Under traditional contract principles, "a change in Federal policy" and "Legislative Action" from Provision 3(b) should be interpreted *ejusdem generis*, or "of the same kinds, class, or nature." *Cf. Avenues in Leather, Inc. v. United States*, 178 F.3d 1241, 1243 & n.1 (Fed. Cir. 1999) (quoting Black's Law Dictionary (6th ed. 1990)). Thus, any policy change recognized by Provision 3(b) must carry the same significance as Legislative Action. Under the Administrative Procedure Act, there is no effective "change" in Federal policy until various requirements are met, such as publication in the Federal Register and opportunity for public comment. 5 U.S.C. § 552(a)(1)(D)-(E); *see Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999); *cf.* Termination of the Royalty-in-Kind (RIK) Eligible Refiner Program, 75 Fed. Reg. 15,725 (Mar. 30, 2010). There was no publication in this case and, consequently, the Board erroneously concluded that the Secretary's announced intention resulted in the type of change in Federal policy that would result in the vitiation of valid contracts.

Furthermore, the Board erred when it relied on a dictionary definition for "policy" that was divorced from the Precedent Agreement. *See Rockies Express*, 11-2 BCA ¶ 34,847, at 171,423 (quoting Webster's New Collegiate Dictionary 882 (1979)). In particular, the Board defined "policy" as

> a definite course of action or method of action selected among alternatives in light of given conditions to guide and determine present and future decisions; a high-level plan embracing the general goals and acceptable procedures, especially of a governmental body.

*Id.* This general dictionary definition of "policy" overlooks the context in which the term arose and the intention of the parties—most notably, the initial negotiations by the parties on the Precedent Agreement and Rockies Express's unwillingness to agree to a termination for convenience clause. *See Metric*, 169 F.3d at 752 ("[T]o interpret disputed contract terms, the context and intention of the contracting parties are more meaningful than the dictionary definition."). We therefore conclude that the Secretary's announced intention did not constitute a "change in Federal . . . policy" that would have limited Interior's liability for refusing to sign the Rockies Express East FTSA.

Finally, we address whether Interior may escape damages through post-termination actions such as its attempt to terminate the Precedent Agreement under Provision 3(b), which occurred after it had breached the Precedent Agreement. Relying on *Northern Helex Co. v. United States* (*Helex III*), 524 F.2d 707 (Ct. Cl. 1975), Rockies Express argues that Interior cannot rely on post-breach events to limit damages. Rockies Express maintains that upon termination for Interior's material breach, the balance owed on the contract immediately became due so it is entitled to damages equal to the full value of the contract.

As our predecessor court has recognized,

[a] material breach does not automatically and ipso facto end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed).

*Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976). In this case, Rockies Express chose to terminate the contract upon Interior's material breach. As a result, under *Helex III*, Rockies Express is entitled to damages through the end of the contract period regardless of any post-termination actions performed by Interior. In particular, Interior's attempted termination of the contract following its material breach was ineffective to limit damages because Interior could not terminate a non-existing contract. *Helex III*, 524 F.2d at 716. It follows that Rockies Express is entitled to compensatory damages designed "to put [it] in as good a position as that in which [it] would have been put by full performance of the contract." *Id.* at 713. We conclude that it was improper for the Board to limit damages as of October 31, 2009.

The burden to determine the quantum of Rockies Express's compensatory damages rests on the Board. We observe that by claiming two alternative entitlements to the balance due on the contract ($173,230,601 or $130,975,417), Rockies Express is requesting not only its profits throughout the full term of the Precedent Agreement, but also the costs it avoided having never shipped natural gas to Interior on Rockies Express East. Recovery of the full contract price presumes that Rockies Express was unable to find another shipper willing to assume Interior's 2.5% reservation after undertaking reasonable efforts. This decision is not for this court to make and we instruct the Board to make this determination on remand. Nevertheless, we hold that Rockies Express is only entitled to "recover its pecuniary loss of anticipated and unearned profits" for the contract term, not the entire value of the contract when it includes costs avoided or offsets gained through mitigation. *Helex III*, 524 F.2d at 721.

## V.  CONCLUSION

In sum, we conclude that review of the Precedent Agreement fell within the Board's jurisdiction, and we affirm that Interior materially breached that agreement. We reverse the Board's decision that limited liability due to a purported change in policy by Interior.  Accordingly, for the reasons set forth in this opinion, we affirm-in-part, reverse-in-part, and remand for the purpose of calculating Rockies Express's damages.

**AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED**

COSTS

Costs to Rockies Express.